In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-06-568 CV


____________________



THOMAS LOUIS, Appellant



V.



MOBIL CHEMICAL COMPANY, a Division of Exxon Mobil


Oil Corporation, JAMES BOWSER, and RANDALL ROY, Appellees






On Appeal from the 136th District Court


Jefferson County, Texas


Trial Cause No. D-173,880






OPINION


 After his employment with Mobil Chemical Company ceased, Thomas Louis sued his
former employer and two supervisors, James Bowser and Randall Roy, for intentional
infliction of emotional distress, defamation, and retaliation. The trial court granted summary
judgment for all defendants. The four issues raised by Thomas on appeal contend material
fact issues exist as to each of the claims and that the trial court erred in granting summary
judgment. We find no error and affirm the judgment.

 Louis alleged that he falsified equipment safety reports at the direction of supervisors
Bowser and Roy. Louis's petition alleged that in May 2004 Louis was accused of
intentionally falsifying documents and was verbally abused, and that as a result he suffered
a mental collapse. Louis alleged he was terminated on July 29, 2004, for violating the
company's ethics policy. Louis also alleged that Bowser and Roy frequently used obscene
and profane language when speaking to him. Louis alleged that Bowser, Roy, and Mobil
(through Bowser and Roy as "vice-principals") acted intentionally and recklessly, that their
conduct was extreme and outrageous, and that the conduct proximately caused Louis severe
emotional distress. Louis alleged that defamatory and false statements of fact were published
by the appellees "both verbally through its vice-principals and in writing" and that the
statements were made with actual malice and/or with negligence. In the alternative, Louis
"claim[ed] the protection of Texas Labor Code, Art. 451.001." (1) 

 The appellees filed a combined traditional and no-evidence motion for summary
judgment. Tex. R. Civ. P. 166a(c), (i). Regarding Louis's claim of intentional infliction of
emotional distress, the appellees argue that the supervisors' use of vulgar language and
instructions to Louis regarding preventive maintenance records, and the company's
investigation and termination of Louis, are not extreme and outrageous as a matter of law and
they contend that Louis had no evidence the appellees' conduct was extreme and outrageous. 
Regarding Louis's defamation claim, the appellees moved for summary judgment on the
grounds that any statement concerning Louis's falsification of records or violation of the
company's ethics policy was true or substantially true. Appellees also sought summary
judgment on the grounds that Louis had no evidence that any of the three defendants made
a defamatory statement, that any such statement was false, and that any such statement was
made negligently or with actual malice. Regarding Louis's retaliation claims, the appellees
moved for summary judgment on the grounds that seven months after the visit to the plant
nurse Louis was discharged for the legitimate non-discriminatory reason that he violated the
company's ethics policy by falsifying preventive maintenance records. They also moved for
summary judgment on the grounds that Louis had no evidence of a causal connection
between a workers' compensation proceeding and his discharge. 

 In his summary judgment response, Louis concedes that the issue of whether the
defendants' actions were sufficiently outrageous to constitute intentional infliction of
emotional distress is a matter of law to be resolved by the trial court. In his response and on
appeal, Louis argues all of the conduct must be evaluated as a whole to determine whether
it was extreme and outrageous. "[W]hen repeated or ongoing severe harassment is shown,
the conduct should be evaluated as a whole in determining whether it is extreme and
outrageous." GTE Sw., Inc. v. Bruce, 998 S.W.2d 605, 616 (Tex. 1999). Bruce concerned
a pattern of conduct by a single supervisor. Id. at 608. Here, we have two individual
defendants and one corporate defendant; we cannot simply hold Bowser's conduct to be
extreme and outrageous based upon acts committed not by Bowser but by Roy. Therefore,
we will examine each individual defendant's conduct in the context of the entire case to
determine whether that defendant's conduct is so extreme and outrageous as to give rise to
tort liability. 

 In his response to the trial court, Louis argued the following conduct was extreme and
outrageous:


 Louis "filed fraudulent documents with the company in order to avoid
threatened fictitious claims by his supervisors which would end his career." 

 "Over a long period of time, the supervisors repeatedly insinuated that they
were willing to misrepresent the truth" to obtain Louis's termination in a way
that could not be challenged in court.

 "The threats were intertwined with derogatory language intended to humiliate"
Louis. 

 The threats of termination "were essentially blackmail" that compelled Louis
"to falsify documentation or lose his job." 



 Louis was employed as an instrument technician at Mobil from 1998 until July 29,
2004. In his deposition, Louis related the following incidents in which he was subjected to
vulgar language: 


 An unidentified person cursed at Louis for working on the wrong meter. 


 


 The same day, Roy used profanity and an ethnic slur during a conversation
about calibrating a meter. Louis then spoke to Bowser and told Bowser he felt
that they were not properly calibrating the meter. As a result, Bowser wrote
out a work order to replace all the meters. 

 Roy used a curse word when Louis asked Roy to assist him in replacing a
meter. Louis went to Bowser, who called in a company representative to
install it. 

 On another occasion, a thermal oxidizer blew up. Roy used profanity when
Louis told Roy they had to shut down the thermal oxidizer before he worked
on the meter. Someone else did the job. 

 After an incident for which Louis was written up, Bowser used profanity in
relating the effect of his supervisors' displeasure with Bowser over the
incident. 

 Roy used a curse word when Louis provided incomplete paperwork because
Roy wanted all of Louis's paperwork to reflect 100 percent completion.
According to Louis, Roy knew Louis had not actually completed the work but
he did not want Louis to fill out a deferral form because . . . Roy wanted to be
able to show that Louis had been doing the work by himself. Louis had
replaced three people. 



 In addition to the events described in his deposition, Louis provided a summary
judgment affidavit in which he states that his supervisors regularly used profanity. In his
deposition, Louis admitted to using profanity himself on the job, but asserted that he did not
use such language in a way that belittled others and he could not personally recall using
profane language. In his affidavit, Louis averred that on more than fifty occasions Roy or
Bowser used a racial slur when speaking to him. He also states that on at least twenty
occasions Bowser and Roy "openly threatened to fabricate false accusations to 'blackball'
me such that I would never be able to get a decent job in the future." 

 Louis admits he falsified preventive maintenance inspection reports in which he
claimed work had been completed which he did not perform. In his deposition, Louis
explained, as follows: 

 Q. On these calibration checks where you filled out the work that you
-- or filled out the paperwork saying that you did it, but you didn't do the work,
is Randall Roy the only one that told you to do that?


 A. I want to say yes.


 Q. All right. And did he tell you specifically to fill out the paperwork
without doing the work, or did he tell you, "I don't want any deferrals"?


 . . . .


 A. Okay. What Randall told me was to sign the compliance form and
then at a later date, he would call me back and say -- it could be sometimes a
month later, sometimes two months later -- and say, "I need the work for my
compliance form." 


 And I'd say, "What work?"


 And he would say, your PMs for X month.


 And then I'd say, "Well, this is what I have."


 Then he--he would say, "Don't bring me no [expletive] unless it's a 100
percent complete." I tried once, I tried probably several times to do a deferral;
but he would not accept the deferral form from me because during that time he
had situations going on with the per se "white boys" and he didn't want any of
that [expletive] from me because he wanted my [expletive]--to say, "T.P. has
been doing all of this by his self," ya, ya, ya, "we used to have this many
people" -- well, excuse the ya, ya, ya. "But T.P. has been doing his work by
himself at a 100 percent completions," and it was easier for his Tier 1 reports
on that.


 Then at a later date, he would tell me to then produce the -- the filled
out PMs reflecting a 100 percent completions, even though the work was not
performed.


 Q. He told you to turn in PM completion forms without doing the
work?


 A. That's correct.


 Q. In those exact words?


 A. Give me a 100 percent completion, showing it to me with
paperwork to support it.


 Q. Well, he expected you to do your job, didn't he?


 A. When I come to him with perhaps -- just use a number -- 3 or 4
meters that were properly calibrated, he'd say that -- "You get your [expletive]
out of my office with this [expletive]. I want all of it."

 I said, "Well, I didn't have time to complete all the functions I want. 
I can do a deferral form."


 "I'm not taking no deferral. Get your [expletive] out of my office. 
Come back to me when you have a 100 percent paperwork"; and mind you,
this could be -- like if the month is August, this could be like October when
he'll tell me this.


 . . . .


 Q. All right. So, throughout that four-month period, thereabouts, you
had responsibility for doing PM work on vapor detectors, correct?


 A. That's correct.


 Q. Okay. Did you do the PM work on the vapor detectors?


 A. I did PM work on vapor detectors.


 Q. Okay. Did you do it all according to ExxonMobil procedures?


 A. When I did a PM on vapor detectors, I did it according to Mobil's
procedure.


 Q. All right. And did you fill out any paperwork incorrectly in regard
to vapor detectors?


 A. Under my instructions from Randall Roy to bring him a 100 percent
completion of forms, I did work incorrect.


 . . . .


 Q. In what way was your paperwork not correct?


 A. The fact that the work was not performed.


 Q. So, you would go out into the field and perform some of the checks
but not others?


 A. With the multiple duties that I had on that unit, I was not able to
complete all of my PMs.


 Q. Okay. And yet you filled out the paperwork showing that you did
complete the work on the vapor detectors?


 A. Under fear of my job, under the fear of being blackballed from ever
getting a job, under the fear of being fired, I did what I was instructed to do by
bringing a 100 percent -- showing a 100 percent completion of my work, even
though my work was not complete. 


 In his summary judgment affidavit, Louis states that he was ordered by Bowser and
Roy to falsify inspection reports. 

 In the first instance, whether a defendant's conduct may reasonably be regarded as so
extreme and outrageous as to permit recovery for intentional infliction of emotional distress
is a question of law. Wornick Co. v. Casas, 856 S.W.2d 732, 734 (Tex. 1993). "[I]ntentional
infliction of emotional distress is a 'gap-filler' tort never intended to supplant or duplicate
existing statutory or common-law remedies." Creditwatch, Inc. v. Jackson, 157 S.W.3d 814,
816 (Tex. 2005)(footnote omitted). Where the gravamen of the complaint is really another
tort, intentional infliction of emotional distress is unavailable even if the evidence would be
sufficient to support a claim for intentional infliction of emotional distress in the absence of
another remedy. See Hoffmann-La Roche Inc. v. Zeltwanger, 144 S.W.3d 438, 441 (Tex.
2004). "Even if other remedies do not explicitly preempt the tort, their availability leaves no
gap to fill." Creditwatch, 157 S.W.3d at 816. 

 Louis argues that the fact that the speakers were of the same race as Louis does not
mitigate the effect of the racist term and that the repeated threats to end Louis's career,
intertwined with humiliating language and compelling Louis to falsify documentation,
created an intolerable and outrageous environment. However, racial discrimination in the
workplace is actionable through employment discrimination statutes. For instance,
Creditwatch concerned lewd advances by the company's chief executive officer and
subsequent retaliation, which included refusing to provide a reference letter, announcing a
company policy prohibiting contact with former employees, and having the plaintiff evicted. 
Id. at 816-17. Because all of her claims were covered by other remedies, the wronged
employee could not sue for intentional infliction of emotional distress. Id. Zeltwanger also
involved sexual harassment by a supervisor and another supervisor's failure to report the
objectionable conduct. Zeltwanger, 144 S.W.3d at 448. Those elements of the employee's
claim for intentional infliction that arguably fell outside the sexual harassment claim did not
rise to the level of extreme and outrageous conduct. Id. at 449. 

 Louis contends the use of profane and inflammatory language caused him emotional
distress. Such conduct falls within the statutory cause of action for racial discrimination or
harassment. See EEOC v. WC&M Enters., Inc., 496 F.3d 393, 399 (5th Cir. 2007)(citing
elements of hostile work environment claim under Title VII). Those actions identified by
Louis that arguably fall outside the scope of racial discrimination in employment do not rise
to the level of extreme and outrageous. In GTE, the supervisor repeatedly physically and
verbally threatened and terrorized female employees. GTE Sw., Inc., 998 S.W.2d at 613-14. 
Viewed in the light most favorable to the non-movant in this case, Bowser and Roy
threatened to trigger a negative termination of employment unless Louis produced paperwork
showing work had been performed that Roy knew Louis did not have time to perform. A
threat to fire someone and ruin their career falls within the type of ordinary business dispute
that is not actionable as a claim for intentional infliction of emotional distress. See Tex.
Farm Bureau Mut. Ins. Co. v. Sears, 84 S.W.3d 604, 610-11 (Tex. 2002) (mere threats do
not rise to the level of extreme and outrageous conduct); Rescar, Inc. v. Ward, 60 S.W.3d
169, 180 (Tex. App.--Houston [1st Dist.] 2001, pet. granted, judgm't vacated)(threat to
"blackball" worker). After all, an employer "generally can terminate an at-will employee for
any reason or no reason at all." See Mission Petroleum Carriers, Inc. v. Solomon, 106
S.W.3d 705, 715 (Tex. 2003). 

 Louis depends upon the objective to be achieved by the harassing conduct to provide
the extreme degree required to pursue a claim for intentional infliction of emotional distress
in the workplace. Louis alleged Bowser and Roy threatened to ruin his career unless Louis
falsified preventive maintenance records for equipment "used by Defendant to monitor the
flow and release of dangerous chemicals into the environment." Louis alleged that some or
all of the reports "were required by Federal and State health and environmental laws." 
Retaliatory discharge for refusal to perform an illegal act the employee reasonably believed
would subject him to criminal penalties is actionable as an exception to the employment-at-will doctrine. Sabine Pilot Serv., Inc. v. Hauck, 687 S.W.2d 733, 735 (Tex. 1985). 

 Louis's situation is distinguishable from Sabine Pilot in three respects: (1) Louis did
not refuse to do the allegedly illegal act; (2) Roy and Bowser did not cause Louis's discharge
-- instead, Ken Jackson terminated Louis for violating the company's ethics policy; and (3)
Mobil fired Louis for performing the allegedly illegal act, not for refusing to do it. Those
distinctions indicate Louis could not prevail on a Sabine Pilot claim, but the likelihood of
success on the claim does not affect the gravamen of his complaint. The nature of the
complained-of conduct by Bowser and Roy is the threat to wrongfully discharge Louis unless
he falsified his reports. That conduct would give rise to a Sabine Pilot claim but for Louis's
participation in the allegedly illegal conduct. Where the gravamen of the complaint is really
another tort, intentional infliction of emotional distress is unavailable. Creditwatch, 157
S.W.3d at 816; Zeltwanger, 144 S.W.3d at 441. We hold that the trial court did not err in
granting a motion for summary judgment on Louis's claims for intentional infliction of
emotional distress.

 Next, Louis contends the trial court erred in granting summary judgment on Louis's
defamation claim. At the outset, we note that the person who allegedly made the defamatory
statement was Francis G. Carr, Sr. Carr works as an investigator on the audit staff for
ExxonMobil Corporation. Carr conducted the investigation regarding whether Louis
falsified preventive maintenance records. Obviously, neither Roy nor Bowser could be liable
for a defamatory statement they did not publish. See generally Minyard Food Stores, Inc.
v. Goodman, 80 S.W.3d 573, 577-78 (Tex. 2002). Mobil, however, could be held liable for
a defamatory statement published by its employee if the statement was false, made within the
scope of the employee's general authority in furtherance of Mobil's business, and for the
accomplishment of the object for which the employee was hired. Id. 

 Mobil moved for summary judgment on the ground that the statement was true and
on the ground that Louis had no evidence that the statement was false. In his deposition,
Louis testified that he told Carr and the others investigating the matter "that I'd fill out
paperwork knowing that the performance had not been done." Louis's summary judgment
affidavit states that in the presence of others Carr said that "'you falsified company reports;"
"it was your idea;" and "it was your decision to do so.'" According to Louis's affidavit,
"Carr made this statement and it is false." Throughout this litigation, Louis has admitted that
he did in fact falsify the reports; the defamatory nature of Carr's statement could arise only
from the statement that it was "your idea" and "your decision to do so." Louis has never
contended that he did not realize that he was falsifying the reports or that what he was doing
was wrong and against company policy. Louis argues that the statement is defamatory
because it "suggest[s] a more disreputable character, i.e. that Appellant hatched the plot for
self-advancement motives as opposed to merely attempting to find a way to find some relief
from the oppressive and degrading work environment that he found himself in." 

 Literally true statements are not slanderous merely because others might infer
dishonesty. Randall's Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 646 (Tex. 1995). 
Nonetheless, "a plaintiff can bring a claim for defamation when discrete facts, literally or
substantially true, are published in such a way that they create a substantially false and
defamatory impression by omitting material facts or juxtaposing facts in a misleading way." 
Turner v. KTRK Television, Inc., 38 S.W.3d 103, 115 (Tex. 2000). In deciding whether there
is no evidence to support a defamation claim, the entire statement must be viewed in its
context. See City of Keller v. Wilson, 168 S.W.3d 802, 811 (Tex. 2005). 

 Although he admits he falsified his reports, Louis argues the statement makes him
appear to be more culpable than he really is: in other words, he was the mastermind rather
than a reluctant participant. Louis overstates Carr's comment regarding Louis's
responsibility for the violation of company policy. The gist of the statement -- that Louis
knowingly falsified his reports -- is by Louis's own admission the truth. The fact left out of
the statement -- that Roy pressured Louis to complete paperwork knowing that Louis did not
have the time to perform the actual work -- relates to Roy's culpability, not to Louis's, and
does not diminish Louis's personal responsibility for failing to accurately record the work
he performed. (2) Furthermore, the act that would tend to expose Louis to public scorn is the
falsification of the documentation, an act Louis admits is true. The allegedly false fact in
Carr's statement does not render an otherwise true statement defamatory. We hold the trial
court did not err in entering summary judgment for all defendants on Louis's defamation
claims and, accordingly, overrule issue two.

 In his third issue, Louis contends the trial court erred in granting summary judgment
on his workers' compensation retaliation claim. The Texas Labor Code prohibits an
employer from discharging an employee for filing a workers' compensation claim in good
faith. Tex. Lab. Code Ann. § 451.001(1). "To prove a 'retaliatory discharge' claim, the
employee must show that the employer's action would not have occurred when it did had the
employee's protected conduct -- filing a workers' compensation claim -- not occurred." 
Haggar Clothing Co. v. Hernandez, 164 S.W.3d 386, 388 (Tex. 2005). Circumstantial
evidence and reasonable inferences from the evidence can establish the causal connection. 
Cont'l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 451 (Tex. 1996). If the employee can
establish a causal link, the employer must rebut the alleged retaliation by showing that there
was a legitimate reason for the discharge. Id. Although not elements of retaliation,
circumstantial evidence offered to establish a causal link may include: "(1) knowledge of
the compensation claim by those making the decision on termination; (2) expression of a
negative attitude toward the employee's injured condition; (3) failure to adhere to established
company policies; (4) discriminatory treatment in comparison to similarly situated
employees; and (5) evidence that the stated reason for the discharge was false." Aust v.
Conroe Indep. Sch. Dist., 153 S.W.3d 222, 228 (Tex. App.--Beaumont 2004, no pet.). 

 In his deposition, Louis testified that Roy told him on December 29, 2003, to be back
in Roy's office in ten or fifteen minutes with anything else he might have to support his
paperwork. Louis realized his job was in jeopardy; his chest started to hurt and he went to
Mobil medical. Louis went on medical leave until he was fired on July 29, 2004. At
deposition, Louis was asked, "Did you ever ask to file a Workers' Comp claim about any of
this?" He replied, "I asked James [sic] Sitton. She told me that you don't want to do that
because that will be a recordable event for the plant and they don't want any recordables
because of Workers' Compensation Act." (3) Louis identifies no other evidence to raise a fact
issue against the appellees' motion for summary judgment. Louis does not suggest that either
Bowser or Roy are personally liable for Louis's retaliation claim. He argues that the
comment by the company nurse that Mobil would not want a recordable claim is
"unmistakable evidence of animosity towards reporting workers compensation reports: it
accepts the premise that there is an injury and focuses solely on whether it is a 'reportable,'
i.e. on-the-job, claim." 

 Before we consider whether the evidence raises a fact issue on a retaliatory motive,
however, we must determine whether any evidence supports a causal link between Louis's
filing of a workers' compensation claim and the termination of his employment. There is
summary judgment evidence that Louis was on medical leave from the day he learned the
company was aware of the deficiencies in Louis's reports until the day his employment was
terminated. There is evidence that he inquired about workers' compensation but there is no
evidence that he filed a workers' compensation claim. Louis does not identify any summary
judgment evidence that any of the people involved in the decision to terminate Louis's
employment were aware of Louis's conversation with Sitton or that they suspected Louis
might have filed a workers' compensation claim. 

 Louis's employment was terminated on July 29, 2004, for violating Mobil's ethics
policy. The stated reason for the discharge related solely to Louis's falsification of the
reports. The appellees attached Mobil's "Standards of Business Conduct" to their motion for
summary judgment. The ethics standard states, "Employees must understand that the
Corporation does care how results are obtained, not just that they are obtained. Employees
must be encouraged to tell higher management all that they are doing, [and] to record all
transactions accurately in their books and records . . . ." Louis concedes he falsified his
reports and does not identify any evidence in the summary judgment record that the stated
reason for the discharge was false. 

 The discrepancies in Louis's paperwork surfaced before Louis's chest began to hurt
and there is no evidence in the summary judgment record to indicate that the investigation
and subsequent decision to terminate Louis's employment was a pretext to disguise a
retaliatory discharge. Thus, although Louis produced some evidence that a Mobil employee
discouraged Louis from filing a claim for workers' compensation, there is no evidence that
either directly or inferentially connects the nurse's comment to Louis's discharge from
employment or that shows that Mobil did not have a legitimate non-discriminatory reason to
terminate Louis's employment. The trial court did not err in granting motion for summary
judgment for all defendants on Louis's retaliation claim. We overrule issue three.

 Louis's final issue contends in a general assignment of error that the trial court erred
in granting summary judgment. See Malooly Bros., Inc. v. Napier, 461 S.W.2d 119, 121
(Tex. 1970). In addressing his other issues, we conclude the trial court properly granted
summary judgment as to all of the claims and parties before the trial court. We overrule issue
four and affirm the judgment.

 AFFIRMED.


 __________________________________

 CHARLES KREGER

 Justice


Submitted on September 27, 2007

Opinion Delivered May 1, 2008



Before McKeithen, C.J., Kreger and Horton, JJ.
1. See Tex. Lab. Code Ann. § 451.001 (Vernon 2006). 
2. The statement was made during Carr's investigation of Louis's reports. Whether
Roy's conduct was also being investigated is not a matter before this Court. Presumably,
Carr would not be expressing opinions about misconduct by other employees, such as Roy,
to Louis.
3. In his summary judgment affidavit, Louis identifies this person as a nurse named Jane
Sitton. In his summary judgment affidavit, Louis states that he was placed on medical leave
due to his emotional condition, and that a private physician diagnosed him with a major
depressive disorder and prescribed medication.